KEKER, VAN NEST & PETERS LLP
BROOK DOOLEY - # 230423
bdooley@keker.com
TRAVIS SILVA - # 295856
tsilva@keker.com
CHRISTOPHER S. SUN - # 308945
csun@keker.com
CHRISTINA LEE - # 314339
clee@keker.com
JACQUELINE CONCILLA - #335733
jconcilla@keker.com
EVAN H. MCINTYRE - #349409
emcintyre@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
VICTORIA PETTY - #338689
vpetty@lccrsf.org
JORDAN WELLS - #326491
jwells@lccrsf.org
131 Steuart Street #400
San Francisco, CA 94105
Telephone:     415 814 7631

*Attorneys for Plaintiffs*

ISMAIL J. RAMSEY
United States Attorney
MICHELLE LO
Chief, Civil Division
KENNETH W. BRAKEBILL
kenneth.brakebill@usdoj.gov
KELSEY J. HELLAND
kelsey.helland@usdoj.gov
450 Golden Gate Avenue, Box 36055
San Francisco, CA  94102-3495
Telephone:   415 436-7167
Facsimile:    415 436-7169

*Attorneys for United States of America*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| WILBUR P. G.; WILFREDO BALTAZAR P. E. a minor child; ERENDIRA C. M.; YASMIN ALICIA M. C. a minor child; JOSHUA G. G.; and KARL LUIS G. G. minor child,<br><br>            Plaintiffs,<br><br>       v.<br><br>UNITED STATES OF AMERICA,<br><br>            Defendant. | Case No. 4:21-cv-04457-KAW<br><br>**DISCOVERY LETTER BRIEF RE: PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION** |

2294949

Dear Judge Westmore:

Plaintiffs Wilbur P.G., Wilfredo Baltazar P.E., Erendira C.M., Yasmin Alicia M.C., Joshua G.G., and Karl Luis G.G. (collectively, "Plaintiffs") and Defendant United States of America ("Defendant") (collectively, the "Parties") hereby jointly submit this letter regarding a discovery dispute, pursuant to Paragraph 14 of the Court's Standing Order. The Parties met and conferred by video conference on June 26, 2023, and were unable to resolve the disputed issue described below. The Parties hereby attest that they have complied with Section 9 of the Northern District of California's Guidelines for Professional Conduct.

Dated: July 3, 2023

Respectfully submitted,

*/s/ Travis Silva*

BROOK DOOLEY
TRAVIS SILVA
CHRISTOPHER S. SUN
CHRISTINA LEE
JACQUELINE CONCILLA
EVAN H. MCINTYRE
KEKER, VAN NEST & PETERS LLP
*Attorneys for Plaintiffs*

Respectfully submitted,

*/s/ Kelsey J. Helland*

Kenneth W. Brakebill
Kelsey J. Helland
UNITED STATES ATTORNEY'S OFFICE
*Attorneys for Defendant*

2294949

**Unresolved Discovery Issue:** Whether the Government should be compelled to produce documents in response to certain requests in Plaintiffs' Third Set of Requests for Production.
**Plaintiffs' Position:** Relying on the "Common Discovery," which is a set of documents that Defendant produced in similar litigation in Arizona and in this case (*see generally* Dkt. 83 at 2-3 for background), Defendant refuses to respond to certain RFPs in Plaintiffs' Third Set. This position ignores the Court's holding that any discovery burden Defendant bore in Arizona does not necessarily relieve it of its obligation to produce documents responsive to Plaintiffs' requests here. *See* Dkt. 83 at 4. Further, Defendant raises burden and proportionality objections without substantiation. Defendant's refusal to fulfill its discovery obligations is improper, and Plaintiffs ask the Court to order Defendant to produce documents responsive to the RFPs outlined below.
**RFPs 61-62:** These RFPs seek documents sufficient to show how DOJ and DHS develop sub-regulatory policy. Such documents are relevant to Plaintiffs' allegations that DOJ and DHS developed and implemented the family-separation policy despite knowledge that it would harm people like Plaintiffs. *See* Dkt. 1 at 5-21. Defendant did not dispute relevance during meet/confer. After refusing to produce **any documents** in response to this RFP, Defendant directed Plaintiffs to a DHS 30(b)(6) witness's deposition in the Arizona litigation, while refusing to identify **any specific responsive testimony** in that DHS deposition transcript and failing to identify **any document** regarding DOJ's procedures for developing sub-regulatory policy. There is a difference between testimony on how agencies develop such policy and the actual documents outlining official written policies and procedures. Defendant argues that searching for responsive documents would be burdensome, but it has shared **no specific details about that purported burden** and has otherwise refused to engage in any meaningful dialogue on this issue, and it has shared **no counterproposals** to narrow the purported burden.
**RFPs 63-65:** These RFPs seek discovery into the personnel files, social media posts,[1] and complaints about or negative evaluations of the specific Border Patrol agents who Defendant listed in its initial disclosures and who separated Plaintiffs. These documents are relevant to Plaintiffs' IIED claim and to Plaintiffs' rebuttal to Defendant's discretionary function exception (DFE) affirmative defense. First, the IIED claim asks whether the conduct is outrageous, i.e., whether the conduct "shocked the conscience." Plaintiffs are entitled to this discovery because, if Defendant knew that any of them harbored animus toward immigrants, a fact-finder could conclude that Defendant's (claimed) delegation of discretion to separate immigrant families shocks the conscience. Second, Plaintiffs rebut Defendant's DFE defense by arguing that Defendant violated the Due Process Clause's family-integrity guarantee, which also employs a "shocks the conscience" test that other courts have applied to determine that the policy at issue here was unconstitutional. *See* Dkt. 1 at ¶ 58 & n.54, 198 & n.85. It is unconstitutional for an official to act against an individual because of racial animus, *Palmore v. Sidoti*, 466 U.S. 429, 430–31 (1984), and a constitutional violation vitiates the DFE defense, *Nurse v. U.S.*, 226 F.3d 996, 1002 n.2 (9th Cir. 2000). So if an official's decision to separate Plaintiffs was motivated by racial animus, that fact would negate Defendant's DFE defense. The requested materials could help Plaintiffs detect whether the agents had a record of displaying such animus. Finally, Defendant does not and cannot raise a burden objection to these RFPs. Plaintiffs are requesting a limited number of files for a handful of Border Patrol agents, and the request is narrowly tailored

---

[1] In 2018, thousands of Border Patrol agents participated in social media conversations denigrating migrants. A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica, July 1, 2019.

1

to the agents who Defendant identifies as being involved in separating Plaintiffs.
**RFP 74:** Defendant's position here is far from substantially justified. Plaintiffs allege that in the run-up to the implementation of its family-separation policy, many people put Defendant on notice of the harm that such a policy would cause. Dkt. 1 at ¶¶ 36-40. And specifically, Plaintiffs allege that DHS's Office of Civil Rights/Civil Liberties (CRCL) received "scores" of complaints about that harm and that Defendant's decisionmakers ignored that information. *Id.* ¶¶ 36, 40. Such knowledge can demonstrate that Defendant acted with a reckless disregard to the risk that the policy would inflict emotional distress, which is an element of Plaintiffs' IIED claim. *Id.* ¶ 215. **But Defendant refuses to produce the complaints that CRCL received or any related communications.** While Defendant produced a publicly-available spreadsheet summarizing some information about the complaints, there is no dispute that Defendant did not search for or produce (1) the initial complaints that CRCL received and (2) follow-up communications from CRCL to other officials regarding next steps, if any, that DHS took to address the complaints.

Despite the obvious proportionality of this request, Defendant made no narrowing proposal and instead asserted that searching for these files would be burdensome because it would involve reviewing files in separate shared folders. This purported burden is no different from the ordinary burdens of ESI discovery. *See* Dkt. 83 at 4 (rejecting Defendant's position that its burden in the Arizona litigation should limit Plaintiffs' opportunity to conduct discovery here). Defendant claims that producing a 5-page CRCL report from July 2019 is sufficient because it "reflects" CRCL's investigation. The report cuts in favor of further discovery because it shows that CRCL conducted its investigation, and discussed family separation with CBP, *in 2018*, thus demonstrating that CBP officials may have had knowledge about the complaints' substance. Defendant refers to 120 documents purportedly "mentioning" the investigation, but makes no effort to identify that evidence to the Court (or Plaintiffs) and thus fails to show that Plaintiffs have obtained adequate discovery on this subject. Plaintiffs are willing to confer about search terms and custodians (Defendant refused to do so), but given the centrality of the CRCL documents to the case, the Court should compel the production of the requested documents.
**RFP 80:** This RFP seeks documents and communications regarding the protocols that governed CBP officials' separations of Parent Plaintiffs from their children. This request includes documents related to when and how families should be separated, what CBP employees should communicate to family members about separation, and how to care for children after separation. These documents bear on Plaintiffs' allegations; for instance, if documents reveal that Defendant provided scant guidance to CBP officials regarding family separations, such evidence would show Defendant's reckless disregard to the risks posed by the policy. Dkt. 1. ¶ 215.

Defendant's search for documents responsive to this RFP, however, was inadequate. To search for these documents, Defendant tasked a non-attorney to search his own email folders and other Government documents using a single keyword: "SWB ConOps." Defendants represented to Plaintiffs that the non-attorney "determined that no responsive documents exist beyond the Common Discovery." Thus, Defendant delegated document collection and responsiveness review to a non-lawyer—during which review he somehow determined that all responsive documents were already accounted for in the Common Discovery—without meaningful attorney supervision. This is improper because "[i]n the era of e-discovery, attorneys must take responsibility for ensuring that their clients conduct a comprehensive and appropriate document search." *Abadia-Peixoto v. U.S. Dep't of Homeland Sec.*, No. CV 11-04001 RS (KAW), 2013 WL 4511925, at *2 (N.D. Cal. Aug. 23, 2013).
**RFPs 87-89:** These requests seek documents that Defendant provided to Cayuga Centers and

2

Southwest Key Programs, contract shelters that housed the Minor Plaintiffs, concerning (1) Defendant's separation of families, (2) how Defendant tracked and facilitated reunification of separated family members, and (3) the number of separated minors in the contractors' custody, as well as related communications. Such documents are relevant to Plaintiffs' allegations that Defendant failed to adequately prepare contractor shelters for the influx of separated minors, demonstrating a reckless disregard for the harm that family separations could cause.

Defendant does not contest relevance. Instead, Defendant, which offers no hit counts or other specific information about burden, offers unpersuasive reasons for standing on the Common Discovery and a limited set of "Plaintiff-specific" searches. Defendant claims that Plaintiff-specific" searches, which were limited searches of Plaintiffs' names, initials, or alien numbers, would produce responsive policy-type documents. That makes no sense. Documents about how Defendant and its contractors reunified immigrants *generally* would not necessarily include references to Plaintiffs' *specific* names. And Defendant's experience in "prior cases" says nothing about what was happening at the specific facilities that housed the children Plaintiffs in this case. Finally, Defendant's invocation of an "unspecified additional set of search terms" is farcical given that Defendant refused to confer about search terms.

**Final positions**: Defendant's failure to confer in good faith stymied Plaintiffs' ability to make narrowing proposals for these RFPs. For example, when conferring about RFP 74, Plaintiffs asked Defendant to identify how many employees investigated the CRCL complaints and whether a primary employee was tasked with compiling information about those complaints. Had Defendant provided a response, Plaintiffs could have made a narrowing proposal tailored to the facts of this and other RFPs. But Defendant consistently refused to engage.

**Defendant's Position:** Plaintiffs fail to show that any of their demands for additional document searches are justified in this matter.

RFPs 61-62: These requests seek documents "sufficient to show all" DOJ and DHS policies and practices concerning how these agencies "develop[] sub-regulatory policy." As an initial matter, these requests are dramatically overbroad; Plaintiffs *cannot* challenge the government's policies through this FTCA suit. *See, e.g.*, *B.A.D.J. v. United States*, 2022 WL 11631016, at *5 (D. Ariz. Sept. 30, 2022) ("To the extent Plaintiffs allege harms resulting from policymaking or agency-wide misconduct, the Court lacks subject matter jurisdiction over those claims."). Contrary to Plaintiffs' unsupported assertion above, Defendant consistently objected to the relevance of these documents since it served its responses. Plaintiffs did not bring an APA claim challenging the procedures used to enact the policies at issue, *see* Compl., and therefore Plaintiffs have no need for these documents.

Moreover, the burden on the government in collecting and reviewing these documents would be massive. The undefined term "sub-regulatory policy" is vague and ambiguous, and has no clear limiting principle. A search for documents related to "*all*" responsive policies and practices for these enormous federal agencies would take substantial government resources and capture countless policies that have nothing to do with this case. Even providing the "hit counts" Plaintiffs demand would impose an undue burden on Defendant to collect and process the documents from these large government agencies.

Finally, to the extent any portion of these request could be relevant, Plaintiffs already have information related to these issues. The plaintiffs in the Arizona litigation discussed this topic during the deposition of the DHS 30(b)(6) witness (at, *e.g.*, 42:4-60:2 (opening question: "What is the process for developing immigration policy within the Department of Homeland

Security?")), and Defendant produced that transcript. Plaintiffs also have transcripts from high-level DOJ witnesses that discussed the development and implementation of the Zero-Tolerance policy—not to mention 220,000 pages of Common Discovery concerning policy issues.

RFPs 63-65: These requests seek the personnel files of, complaints about, and social media posts authored by the Border Patrol agents involved in Plaintiffs' separations. This information is not relevant to this case. Plaintiffs did not bring a *Bivens* case alleging that individual federal agents deviated from policy and violated their rights; rather, Plaintiffs expressly alleged that they were separated "pursuant to" a specific nationwide policy. *E.g.*, Compl. ¶¶ 17, 67, 217. There is no claim that any of the agents involved in Plaintiffs' separations did anything other than follow that policy, nor have Plaintiffs presented any factual basis to pursue this discovery. This is a fishing expedition, plain as day.

Plaintiffs argue they are entitled to this information because the government's discretionary function exception defense is based, in part, on the discretion exercised by these agents. But the fact that the DHS referral policy allowed for discretionary considerations, such as resource constraints, in individual cases does not open the door to invasive discovery into the personal files of the agents involved. Indeed, the discretionary function exception applies "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Plaintiffs argue that these documents could show whether the government's delegation of authority to these agents was unconstitutional, but they offer no support for the proposition that such a standard law-enforcement delegation could itself rise to the level of a constitutional violation, much less one that would defeat the discretionary function exception. Again, there is no evidence or allegation that individual agents committed any violations—Plaintiffs just want to see what they can find.

Finally, the agents' privacy interests weigh against granting this discovery here. The Court should not condone the intrusive examination of federal agents' employment records and social media posts absent some connection to the actual claims and defenses in this case.

RFP 74: This request seeks "all" documents and communications "underlying" a publicly available spreadsheet of approximately 860 complaints involving family separations made to the DHS Office of Civil Rights and Civil Liberties ("CRCL"). Plaintiffs already have (1) the spreadsheet itself, which details the complaints; (2) the July 2019 CRCL report summarizing its findings and recommendations; (3) policy-level deposition transcripts from the Arizona litigation discussing this investigation; and (4) Common Discovery documents discussing this investigation, including from CRCL's leader at the time. Indeed, contrary to Plaintiffs' assertion above, searches within the Common Discovery (such as for mentions of the CRCL complaint numbers identified in the July 2019 report) demonstrate that Plaintiffs already have at least 120 documents and communications mentioning this CRCL investigation.

Nevertheless, Plaintiffs demand more. But the only CRCL investigation conducted into family separation during this timeframe was the investigation reflected in the publicly available July 2019 CRCL report. And as the government explained to Plaintiffs, the remaining documents responsive to this request (such as the underlying complaints and the CRCL opening and closing letters) do not exist in any centralized, readily searchable database. Instead, the government would need to manually pull documents from the separate folders for these 860 complaints, collect the ESI from an additional set of CRCL custodians, and review all of the resulting documents for responsiveness and privilege. Considering all of the evidence Plaintiffs already have regarding this issue, this additional burden is disproportionate and unjustified.

RFP 80: This request seeks all documents and communications concerning the "protocols" the government used for separating the Plaintiff families. The government diligently

4

investigated this request and informed Plaintiffs that it found no additional documents beyond what is in the Common Discovery. As relevant here, the Common Discovery includes the ESI returned by a broad set of "family separation"-related search terms from four supervisory-level CBP officials from the Yuma Sector, which is the geographical region where Plaintiffs were apprehended and separated. Even by themselves, these prior searches constitute a reasonable search for documents responsive to this request. Nevertheless, in response to this request, CBP's former Special Operations Supervisor in the Yuma Sector (who is a Common Discovery custodian and a government subject matter expert in these cases) searched his email folders, shared government drives, and individual drives using the keywords "SWB ConOps" (the Yuma Sector's term for its implementing guidance); after reviewing the results of that search and discussing the issue with his colleagues, the Special Operations Supervisor determined that no responsive documents exist beyond the Common Discovery. That is because planning for implementation of the DHS referral policy within the Yuma Sector was predominately if not exclusively done via in-person discussions. But to be clear, government counsel did not merely defer to this individual's search; Plaintiffs' unsupported assertion that this search was conducted "without attorney supervision" is simply false. Rather, government counsel evaluated this additional search in conjunction with the Common Discovery (such as the May 2018 email thread and Yuma Sector ConOps at CD-US-0049906), considered the individual's expertise with respect to this issue and the types of documents requested, and determined that Defendant had completed a reasonable and diligent investigation.

      Nothing more was required. Indeed, given the extensive search already conducted, Plaintiffs' request for a further search would impose an undue burden on the government, entailing a further ESI collection and document review from an undefined number of custodians, with no way to de-duplicate those documents against what is already in the Common Discovery.

      <u>RFPs 87-89</u>:  These requests seek various documents and communications between the government and the ORR shelters where the minor Plaintiffs were housed. In addition to the Common Discovery, the government agreed to search the records of the ORR Project Officers assigned to these shelters and the ORR Federal Field Specialists and Federal Field Specialist Supervisors assigned to the minor Plaintiffs' cases, using plaintiff-specific search terms.

      Plaintiffs argue that this search is insufficient, but they have not explained why. The government has explained that, based on its experience in prior cases, virtually all of the documents responsive to these requests are already in the Common Discovery, including by reference to specific HHS custodians who communicated with the shelters (e.g., CD-US-0132234; CD-US-0203601; CD-US-0203671; CD-US-0206327; CD-US-0210587 (email threads between HHS and Plaintiffs' shelters)). Moreover, again based on experience in other cases, the government determined that the plaintiff-specific custodians identified above and plaintiff-specific search terms are an appropriate complement to the Common Discovery, because the types of documents requested would largely overlap with documents and communications mentioning the names of children in ORR custody (such as the minor Plaintiffs). By contrast, Plaintiffs' demand for some unspecified additional set of search terms would bring in large numbers of non-responsive documents and communications between HHS and the shelters, which would require significant effort to process and review. In light of what Plaintiffs already have, there is no reason for the government to be saddled with that burden.
**Defendant's Final Proposed Compromise**:  As the discussion above makes clear, Plaintiffs consistently fail to appreciate the evidence they already have. Their insatiable demands for more are not proportional to the needs of this case. Defendant stands on its well-supported responses.

Dated: July 3, 2023

| | |
|---|---|
| Respectfully submitted, | Respectfully submitted, |
| */s/ Travis Silva* | */s/ Kelsey J. Helland* |
| BROOK DOOLEY<br>TRAVIS SILVA<br>CHRISTOPHER S. SUN<br>CHRISTINA LEE<br>JACQUELINE CONCILLA<br>EVAN H. MCINTYRE<br>KEKER, VAN NEST & PETERS LLP<br>*Attorneys for Plaintiffs* | Kenneth W. Brakebill<br>Kelsey J. Helland<br>UNITED STATES ATTORNEY'S OFFICE<br>*Attorneys for Defendant* |