KEKER, VAN NEST & PETERS LLP
BROOK DOOLEY #230423
bdooley@keker.com
TRAVIS SILVA #295856
tsilva@keker.com
CHRISTOPHER S. SUN #308945
csun@keker.com
CHRISTINA LEE #314339
clee@keker.com
JACQUELINE CONCILLA #335733
jconcilla@keker.com
SARA FITZPATRICK #337360
sfitzpatrick@keker.com
EVAN H. MCINTYRE #349409
emcintyre@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Plaintiffs

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
MICHELLE LO (NYRN 4325163)
KENNETH W. BRAKEBILL (CABN 196696)
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorneys
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7167
Fax: (415) 436-6748
kenneth.brakebill@usdoj.gov

Attorneys for Defendant

*[Additional Counsel on the following page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILBUR P. G.; WILFREDO BALTAZAR P. E. a minor child; ERENDIRA C. M.; YASMIN ALICIA M. C. a minor child; JOSHUA G. G.; and KARL LUIS G. G. minor child,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 4:21-cv-04457-KAW<br><br>**JOINT DISCOVERY LETTER RE EXPERT DEPOSITION FEES**<br><br>Judge:  Hon. Kandis A. Westmore<br><br><br><br>Date Filed: June 10, 2021<br><br>Trial Date: September 9, 2024 |

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
RACHEL SHERIDAN #230409
rsheridan@lccrsf.org
JORDAN WELLS #326491
jwells@lccrsf.org
VICTORIA PETTY #338689
vpetty@lccrsf.org
131 Steuart Street #400
San Francisco, CA 94105
Telephone:     415 543 9444

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF NORTHERN CALIFORNIA
BREE BERNWANGER #331731
bbernwanger@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

Attorneys for Plaintiffs

Dear Judge Westmore:

Plaintiffs Wilbur P.G., Wilfredo Baltazar P.E., Erendira C.M., Yasmin Alicia M.C., Joshua G.G., and Karl Luis G.G. (collectively, "Plaintiffs") and Defendant United States of America ("Defendant") (collectively, the "Parties") hereby jointly submit this letter regarding a dispute over expert deposition fees, pursuant to Paragraph 14 of the Court's Standing Order.  The Parties met and conferred by video conference on April 19, 2024, and were unable to resolve the disputed issue described below.  The Parties hereby attest that they have complied with Section 9 of the Northern District of California's Guidelines for Professional Conduct.

Dated:  April 26, 2024

| Respectfully submitted, | Respectfully submitted, |
|---|---|
| */s/ Evan H. McIntyre* | */s/ Kelsey J. Helland* |
| BROOK DOOLEY<br>TRAVIS SILVA<br>CHRISTOPHER S. SUN<br>CHRISTINA LEE<br>JACQUELINE CONCILLA<br>EVAN H. MCINTYRE<br>KEKER, VAN NEST & PETERS LLP<br>*Attorneys for Plaintiffs* | Kenneth W. Brakebill<br>Kelsey J. Helland<br>UNITED STATES ATTORNEY'S OFFICE<br>*Attorneys for Defendant* |

**Unresolved Issue:**  Whether Plaintiffs will be excused from paying deposition fees to Defendant's experts under the "manifest injustice" exception to Rule 26(b)(4)(E).

**Plaintiffs' Statement**

Background. Plaintiffs are three low-income immigrant adults and three of their children. Defendant subjected each of the six Plaintiffs to two examinations, one by a neuropsychologist and another by a psychiatrist. Contrary to Defendant's persistent misrepresentations, Plaintiffs objected to the use of two experts (and particularly the neuropsychologist) as disproportionate to the needs of the case. The Court resolved the related discovery dispute without ruling on the propriety of Defendant's two-expert strategy. Dkts. 107, 110.

Before expert depositions, Plaintiffs (whose experts are pro bono to Plaintiffs) proposed to Defendant that each side cover its own experts' deposition fees. When Defendant declined, Plaintiffs informed Defendant that they would seek relief from paying Defendant's expert fees under Rule 26(b)(4)(E)'s "manifest injustice" exception and promptly disclosed their experts' hourly rates *before* any depositions were taken. The parties agreed to defer raising the dispute until after the conclusion of depositions. *Allstate Ins. Co. v. Electrolux Home Prod., Inc.*, No. 16-CV-303G(SR), 2018 WL 1795637, at *2 (W.D.N.Y. Apr. 16, 2018) (disputes over deposition fees should be raised "after the deposition has taken place"). On April 10, Defendant submitted expert testimony invoices totaling $21,350.[1] On April 15, Plaintiffs reiterated that they would seek relief. Plaintiffs intended to file this Joint Letter on April 22, but the parties ultimately agreed that an April 26 filing would be timely. During the final meet/confer, Plaintiffs renewed their offer that each side be responsible for its own experts' fees. Defendant rejected that offer.

Argument. Plaintiffs must bear Defendant's expert deposition fees "[u]nless manifest injustice would result." Fed. R. Civ. P. 26(b)(4)(E). "To apply the exception, the court must find that the plaintiff is either indigent or that requiring him to pay a deposition fee incurred in litigation that he voluntarily initiated would create an undue hardship." *Harris v. San Jose Mercury News, Inc.*, 235 F.R.D. 471, 473 (N.D. Cal. 2006). The "[C]ourt must weigh the possible hardships imposed on the respective parties and balance the need for doing justice on the merits between the parties against the need for maintaining orderly and efficient procedural arrangements." *Id.*

The balancing inquiry sharply favors Plaintiffs. **First**, Plaintiffs' inability to pay favors shifting costs to Defendant. Plaintiffs could not "pay the[se] court costs and still afford the necessities of life." *Escobedo v. Applebees*, 787 F.3d 1226, 1234 (9th Cir. 2015) (simplified). Because Plaintiffs' counsel paid the initial filing fee, Plaintiffs did not file *in forma pauperis* (IFP) paperwork.[2] However, they likely meet the indigence standard and it is plain that paying deposition fees of about $7,000 per family would "create an undue hardship." *Harris*, 235 F.R.D. at 473. No Plaintiff owns their residence. Most Plaintiffs live with extended family, with many "doubled up," *i.e.*, living with more occupants in their residences permits. Wilbur typically works two jobs to make ends meet. Erendira is a homemaker; her husband typically has regular employment, but his work schedule is variable without guaranteed hours. Joshua, who works in building maintenance, is the sole breadwinner for a large family. Notably, Defendant makes no effort to dispute that this fee would inflict a hardship on Plaintiffs, even after conducting invasive discovery into their incomes. That should be the end of the issue.

---

[1] Psychiatrist Renee Binder charged $750 per hour for 10.5 hours. Psychiatrist Anlee Kuo (who has less experience than Dr. Binder) charged $850 per hour for 9.5 hours. The two neuropsychologists charged $400 per hour; one testified for 7 hours and the other 6.5 hours.

[2] If it would aid the Court's consideration of this dispute, Plaintiffs will file IFP affidavits in support of this letter.

Defendant instead turns the relevant issue (whether the *parties* can pay) on its head, arguing that Plaintiffs' ability to pay is irrelevant because "Plaintiffs' counsel would pay." It cites **no authority** in support of that argument, nor does it cite any agreement on counsel's part to pay such fees. In *Marquez v. City of Phoenix*, the court declined to invoke the "manifest injustice exception" because plaintiffs' counsel, after paying some opposing experts' costs and promising payment of the remainder, abruptly changed course and sought relief. 2010 WL 334627, at *2 (D. Ariz. Jan. 22, 2010). Plaintiffs made no such representations here and instead noted that they would seek relief before depositions started. Defendant further ignores that *Marquez* plaintiffs' counsel were operating for-profit and "advanced" litigation costs as part of their business; here, Plaintiffs' counsel are pro bono and have no financial stake in the outcome of the case. Defendant also relies on *Jones v. Nat'l R.R. Passenger Corp.*, but the *Jones* court analyzed whether a requested expert fee was reasonable, not whether the plaintiff faced manifest injustice in paying that fee. 2022 WL 834315, at *1 (N.D. Cal. Mar. 21, 2022).

The Government does not even attempt to engage with the "undue hardship" balancing test prescribed in *Harris*, instead lamenting Plaintiffs' counsel's "vigorous" litigation of this case. As Defendant would have it, the "manifest injustice" exception would apply only where counsel fails to advocate zealously for their clients; Defendant's argument, if accepted, would chill pro bono participation by making it more costly for lawyers to volunteer. Moreover, the Government turns a blind eye to its own conduct—including conduct this Court has admonished—which forced Plaintiffs to pursue a vigorous discovery. *E.g.*, Dkt. 103 at 2 (noting the Government's eleventh-hour change in litigation position was "an injustice"); Dkt. 106 at 2 nn. 2, 3 (noting the impropriety of the Government's discovery positions); Dkt. 114 at 3 (noting that the Government "violated multiple [C]ourt orders"). Also, Defendant's claims about counsel's financial outlay are overstated. Plaintiffs retained experts and vendors willing to provide free or reduced-cost services, and have taken 11 Zoom depositions of witnesses outside of California, even if they did chose to travel for three critical depositions. Video depositions were necessary given the Government's unwillingness to make available for trial witnesses with testimony favorable to Plaintiffs. In any event, the argument that counsel's payment of litigation costs moots the "undue hardship" exception has been rejected. *See Reed v. Binder*, 165 F.R.D. 424, 427-28 (D.N.J. 1996).

***Second***, Defendant would suffer no hardship from having to bear its own experts' fees. *See Harris*, 235 F.R.D. at 473 (defendant's failure to show its inability to pay militated in favor of fee shifting). Indeed, the extent of the expert fees is a problem of Defendant's own making, as Defendant insisted on retaining two experts per Plaintiff. The Court has already suggested that Defendant's two-expert plan went "too far" and sought examinations which "seem[] to be excessive and overbroad" and not "relevant or necessary." *See* 7/25/23 Hr'g Tr. at 8-9. The depositions confirmed that suspicion. All four defense experts are qualified to assess for and diagnose PTSD and other mental health disorders. Yet, one of the Government's neuropsychologists testified that she was "specifically instructed not to render a diagnosis regarding a trauma-related disorder" by Government counsel. The Government should not be allowed to drive Plaintiffs' litigation costs by doubling the number of experts, subjecting Plaintiffs to duplicative examinations, and thus depositions and deposition fees.

***Third***, the balance between doing justice on the merits and ensuring orderly procedural arrangements favors Plaintiffs. Before the depositions, it was still not apparent to Plaintiffs why Defendant hired two experts per Plaintiff, or even what the division of labor was between the experts. Failing to submit a detailed expert disclosure weighs in favor of invoking the manifest injustice because any other outcome would unfairly disadvantage the other side. *Reed*, 165 F.R.D. at 428-31. Both neuropsychologists testified that the less-than-two-page "summary reports" they submitted for each Plaintiff lacked critical context and were significantly shorter

than their typical expert reports, with one testifying "This is the world's shortest report for a neuropsych eval." These depositions were necessary to understand these witnesses' trial testimony. *See id.* Deposing the psychiatrists was also necessary to understand the full contours of their testimony. For example, the psychiatrist who evaluated the adults admitted that each adult suffered "severe emotional distress"— one of the elements of Plaintiffs' claim—as a result of his or her separation from their children, a fact not disclosed anywhere in her reports. *See* Ex. A. Finally, *Harris* held that whether the case "presents a matter of public significance" (which this case obviously does) is relevant to the "need to do justice," *Harris*, 235 F.R.D. at 474.

*Reed v. Binder*, one of the few cases to expound on the manifest injustice standard, is especially illustrative. "Impoverished" plaintiffs retained a single expert who charged a below-market rate. 165 F.R.D. at 426. Defendants collectively had six experts, who issued short reports of 2-8 pages each. *Id*. Plaintiffs proposed that each side cover their own expert deposition fees, defendants refused, and plaintiffs moved for and were granted "manifest injustice" relief. *Id.* at 425. Similarly, here, Plaintiffs lack means to pay for litigation costs and found pro bono experts, while Defendant retained cumulative experts who submitted cursory reports.

<u>Final compromise position (and Defendant's puzzling rejection of it)</u>. Defendant had the option to accept Plaintiffs' compromise offer and pay just one set of expert fees (its own). Instead, it is choosing to pay Plaintiffs' experts and to take Plaintiffs' manifest injustice challenge to the Court, meaning that Defendant will pay one set of expert fees and might have to pay another set of expert fees (again, its own). The effect of Defendant's seemingly irrational position is clear—it puts the screws to low-income plaintiffs (and their counsel) who have the temerity to challenge conduct that the Government admits worked a "human tragedy," Dkt. 29 at 1, and that the Government's own experts admit caused Plaintiffs "severe emotional distress." The Court should not allow the Government to engage in such a war of attrition and should order the Government to cover its own experts' costs.

**Defendant's Position:**

Plaintiffs' counsel can easily pay the fees for the experts that Plaintiffs' counsel chose to depose. There would be no "manifest injustice" in applying what Plaintiffs admit is the default rule under Federal Rule of Civil Procedure 26.

Rule 26(b)(4)(E) provides that "the court *must* require that the party seeking discovery . . . pay the expert a reasonable fee," "[u]nless manifest injustice would result." (Emphasis added). "[T]he manifest injustice exception is a 'stringent standard.'" *Harris*, 235 F.R.D. at 473. "To apply the exception, the court must find that the plaintiff is either 'indigent or that requiring him to pay a deposition fee incurred in litigation *that he voluntarily initiated* would create an undue hardship.'" *Id.* (emphasis added). The Court considers if "Plaintiffs have vigorously prosecuted their case," and whether "Plaintiffs' attorn[ies]" have "agreed to pay" other litigation costs. *Marquez v. City of Phoenix*, 2010 WL 334627, at *2 (D. Ariz. Jan. 22, 2010); *see also Jones v. Nat'l R.R. Passenger Corp.*, 2022 WL 834315, at *3 (N.D. Cal. Mar. 21, 2022) ("'The election to depose the Defendants' experts is not different in character from the election to pursue, and advance the costs of, other depositions for [plaintiffs'] trial advantage.'") (quoting *Marquez*).

To say Plaintiffs' counsel have "vigorously prosecuted their case" would be an impressive understatement. Plaintiffs' counsel have already deposed 16 witnesses in this case over 20 deposition days, including three where counsel traveled out of state to Arizona, Georgia, and Washington D.C. Plaintiffs' counsel have ordered videos for these depositions, and paid for real-time transcription services—at times refusing to share such services on the ground that Plaintiffs' counsel were paying for them. *E.g.*, Binder Tr. 309:11-14 ("MR. BRAKEBILL: Do you want to give her a live feed, or can she look at it, too? MR. SILVA: Do you want to pay the

4

2639286

court reporter for it?"). Plaintiffs recently demanded to take the pre-trial depositions of 10 additional witnesses. *See* Dkt. 198. The costs of all of these depositions, with the expensive travel and add-ons that Plaintiffs' counsel have ordered, easily runs into the tens of thousands of dollars, if not more. And Plaintiffs' counsel confirmed during the meet-and-confer process that *they*, *not Plaintiffs*, are paying for those services. The same would be true for the expert fees at issue here.

And that does not even count the attorney time. No fewer than eight attorneys from Plaintiffs' private law firm have participated in this litigation (seven of whom appear on this pleading). The billable value of the time spent on this dispute alone no doubt exceeds the fees that Plaintiffs' attorneys would pay for Defendant's experts. Having chosen to spend their considerable resources on an aggressive, no-stone-unturned discovery strategy, Plaintiffs' counsel cannot now claim a "manifest injustice" in having the default discovery rules applied to them. *See Marquez*, 2010 WL 334627, at *2-3 ("There is no manifest injustice in requiring Plaintiffs to pay Defendants' expert fees" where "Plaintiffs, no doubt through the advancement of costs by their attorney, have met the expense of the depositions Plaintiffs thought helpful").

Contrary to Plaintiffs' assertion, both *Marquez* and *Jones* plainly stand for the proposition that, in evaluating a claim for "manifest injustice," the court may consider whether an attorney has demonstrated a willingness to pay other litigation costs that the attorney has determined are useful for the case. *See generally* 2022 WL 834315, at *3; 2010 WL 334627, at *2-3. Neither case relied on the proposition that the attorneys had a financial stake in the outcome.[3] Plaintiffs also claim that the *Reed* case suggests that the Court can ignore "the reality of how litigation is funded," but the court in that case lamented that it had "no information on the fee arrangement between the plaintiffs and their attorney, and under any circumstance the client remains responsible for the costs of the litigation." 165 F.R.D. at 428. Here, by contrast, Plaintiffs' counsel has explicitly confirmed that they, and not Plaintiffs personally, are paying the litigation costs, including the tens of thousands of dollars for the depositions in this case thus far. *See Marquez*, 2010 WL 334627, at *2 (plaintiffs' attorney admitted to paying other costs). Indeed, Plaintiffs' counsel do not deny that they would pay these expert fees as well.

Nor do any of Plaintiffs' other arguments hold water. Plaintiffs assert that the fees would be a burden on them if they had to pay personally. But this is irrelevant, because Plaintiffs' *attorneys* would pay the fees here, and Plaintiffs' *attorneys* make no argument that the fees would impose a hardship on *them*. *See Marquez*, 2010 WL 334627, at *2-3. Moreover, Plaintiffs' assertion that they would qualify as indigent is questionable; for example, Plaintiff WPG made more than $60,000 in 2022 alone. *See, e.g.*, *Martin v. Csaa Ins. Exchange*, 2017 WL 11493382, at *1 (N.D. Cal. Aug. 23, 2017) (collecting cases where incomes between $20,000 and $45,000 were too high for IFP status). But this is a red herring, because Plaintiffs' counsel would pay.[4]

Plaintiffs also try to rewrite history by belatedly challenging Defendant's two-expert approach. Plaintiffs quote the Court's July 25 statements after having only heard from Plaintiffs' counsel, but after Defendant explained the need—including that Plaintiffs were claiming $30 million in damages, including developmental issues and headaches, many of which could be

---

[3] Plaintiffs' counsel have indicated they may seek attorneys' fees and costs. *E.g.*, Dkt. 1 at 63.

[4] Prompted by this dispute, Plaintiffs' experts submitted invoices to Defendant. As Plaintiffs admit, those experts' testimony would have been "pro bono" for Plaintiffs—in other words, the experts are charging one rate for the government, and another rate ($0) for Plaintiffs, for the same testimony. The government questions whether it is proper for Plaintiffs' experts to change their rates *post hoc* based solely on which party is paying. Nevertheless, the government intends to pay Plaintiffs' experts' fees for these depositions, as the Federal Rules of Civil Procedure require.

5

caused by other sources—the Court order the parties to confer further. *See* Dkt. 89. Plaintiffs ultimately agreed to Defendant's approach, *see* Dkt. 102 at 3, with the only remaining disputes being duration and recordings, *see* Dkt. 107. The Court ordered both exams could proceed. *E.g.*, Dkt. 110 & 119. In short, Plaintiffs could have challenged these exams; instead, the parties negotiated about them for months, and finally agreed that both types of exams could go forward.

And to be clear, Defendant deployed its two types of experts efficiently, keeping in mind the time limitations set by the Court. *See* Dkt. 110. As the government explained in its December 1, 2023 neuropsychological expert disclosures, those experts were specifically retained "to conduct neuropsychological testing and to collect data for assessment by Defendant's retained psychiatric experts." The *only* other opinions for which Defendant offered those experts were "any finding[s] relating to potential cognitive or learning disorders," "if specifically identified in their 'Neuropsychological Evaluation Summary.'" And along with the neuropsychologists' Evaluation Summaries—which were intended to be short, given their limited role—Defendant produced to Plaintiffs (1) more than 500 pages of the Plaintiffs' neuropsychological test data taken during the exams, and (2) the audio recordings of Plaintiffs' examinations. Finally, Defendants' neuropsychological experts' approach to the particular cross-cultural issues raised by this litigation was already set forth in the industry-leading textbook chapter, and more than a dozen articles and presentations, they authored on the subject—all of which were identified in Defendant's disclosures. *See, e.g.*, S. Peery *et al.*, *Diversity Considerations in Forensic Neuropsychology*, APA HANDBOOK OF FORENSIC NEUROPSYCHOLOGY (2017). Plaintiffs simply ignore that they had this vast amount of information last December. Moreover, Defendant's psychiatric experts—who were those ones who considered the neuropsychological testing (among other information) to actually offer mental health opinions—are at the top of their field: one was the former President of the American Psychiatric Association (whom Plaintiffs' own expert testified was "extremely qualified"), and the other specializes in child psychiatry with more than 20 years' experience. Dkt. 107-2, 107-3. Requiring Plaintiffs' counsel to pay for the testimony they chose to take is not a "manifest injustice." *See Jones*, 2022 WL 834315, at *3.

Finally, Plaintiffs egregiously misrepresent Defendant's experts' testimony by claiming the experts admitted that the government's conduct caused Plaintiffs "severe" emotional distress. Dr. Binder explicitly rejected Plaintiffs' counsel's attempt to import the "lega[l]" meaning of "severe" into her "medical" testimony. Binder Tr. 242:10-12. As Plaintiffs' selectively de-designated Exhibit A makes clear, Dr. Binder did not adopt that characterization, but instead testified that each plaintiff adult did experience some emotional distress during the time they were separated from their children—opinions that were readily apparent from Dr. Binder's expert reports, contrary to Plaintiffs' misrepresentation above. But more importantly, Dr. Binder and Dr. Kuo opined in both their reports and their testimony that each Plaintiff experienced many other sources of severe trauma unrelated to the separations, both in their countries of origin and since their reunifications up to the present time, and whereas any distress related to their separations improved quickly once each family member knew the whereabouts of the other, the Plaintiffs' other sources of trauma are the more significant causes of any ongoing distress or symptoms they may be experiencing today. Those opinions are found in the other 700 pages of deposition testimony that Plaintiffs have conveniently chosen to shield from the Court's consumption through their selective de-designation. Defendants' experts will explain their *actual* opinions to the Court at the appropriate time. But Plaintiffs' poor attempt at spin only confirms what this dispute is really about: Plaintiffs' counsel's aggressive litigation tactics, which Plaintiffs' counsel have and can easily afford to fund.

<u>Defendant's final position</u>:  The default rule applies; there is no manifest injustice here.

Dated:  April 26, 2024

| | |
|---|---|
| Respectfully submitted, | Respectfully submitted, |
| */s/ Evan H. McIntyre* | */s/ Kelsey J. Helland* |
| BROOK DOOLEY<br>TRAVIS SILVA<br>CHRISTOPHER S. SUN<br>CHRISTINA LEE<br>JACQUELINE CONCILLA<br>EVAN H. MCINTYRE<br>KEKER, VAN NEST & PETERS LLP<br>*Attorneys for Plaintiffs* | Kenneth W. Brakebill<br>Kelsey J. Helland<br>UNITED STATES ATTORNEY'S OFFICE<br>*Attorneys for Defendant* |

## ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3) regarding signatures, I attest that concurrence in the filing of this document has been obtained from the other signatories.

Dated:  April 26, 2024

By:  */s/ Evan H. McIntyre*
Evan H. McIntyre

2639286

# EXHIBIT A

CONFIDENTIAL

```
 1                UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3
 4    WILBUR P.G.; WILFREDO BALTAZAR      )
 5    P.E., a minor child; ERENDIRA C.M.; )
 6    YASMIN ALICIA M.C., a minor child;  )
 7    JOSHUA G.G.; and KARL LUIS G.G.,    )
 8    a minor child,                      )
 9               Plaintiffs,              )
10                  vs.                   )Case No.
11    UNITED STATES OF AMERICA,           )4:21-cv-0044-KAW
12               Defendant.               )
13    _____)
14
15
16         VIDEO-RECORDED DEPOSITION OF RENEE BINDER,
17    M.D., Volume I, taken on behalf of Plaintiffs,
18    beginning at 11:07 a.m., and ending at 6:41 p.m., on
19    Friday, February 23, 2024, before CARLA SOARES,
20    Certified Shorthand Reporter No. 5908.
21
22
23
24
25
```

Page 2

| | | |
|---|---|---|
| 1 | So during that period of time, it was very | 12:22:28 |
| 2 | difficult for her. In fact, she became briefly | |
| 3 | suicidal. But it's -- so that was that trauma. And | |
| 4 | then there is the trauma in Guatemala that started | |
| 5 | from when she was a child. | 12:22:49 |
| 6 | Q  Do you have an opinion as to whether she | |
| 7 | suffered severe emotional trauma when her daughter | |
| 8 | was separated from her? | |
| 9 | A  I just described the trauma that she | |
| 10 | then -- for that period of time, yes. It was -- it | 12:23:02 |
| 11 | was traumatic for her. In fact, she became briefly | |
| 12 | suicidal. | |
| 13 | That went away, as opposed to all of these | |
| 14 | events that went on for years and years and years. | |
| 15 | But yes, that definitely was traumatic for her in | 12:23:18 |
| 16 | terms of having her daughter separated from her, and | |
| 17 | especially during the period when she didn't know | |
| 18 | what had happened to her daughter. And then it got | |
| 19 | better. | |
| 20 | Q  What's the significance of the fact that | 12:23:32 |
| 21 | you keep repeating that her trauma got better when | |
| 22 | she found out that her daughter was, as you put it, | |
| 23 | okay? | |
| 24 | A  The significance of it is that it's a | |
| 25 | brief period of time. It doesn't mean it doesn't | 12:23:48 |

CONFIDENTIAL

```
1                UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF CALIFORNIA
3
4    WILBUR P.G.; WILFREDO BALTAZAR    )
     P.E., a minor child; ERENDIRA     )
5    C.M.; YASMIN ALICIA M.C., a minor )
     child; JOSHUA G.G.; and KARL      )
6    LUIS G.G., a minor child,         )
                                       )
7              Plaintiffs,             )
                                       )
8              vs.                     )Case No.
                                       )4:21-cv-004457-KAW
9    UNITED STATES OF AMERICA,         )
                                       )
10             Defendant.              )
     _____)
11
12
13
14
15
16         VIDEO-RECORDED DEPOSITION OF RENEE BINDER,
17   M.D., Volume II, taken on behalf of Plaintiffs,
18   beginning at 10:03 a.m., and ending at 4:54 p.m., on
19   Monday, March 18, 2024, before CARLA SOARES,
20   Certified Shorthand Reporter No. 5908.
21
22
23
24
25
                                              Page 255
```

```
 1    incidents that happen to you.                          12:11:43
 2    BY MR. SILVA:
 3         Q    And do you have an understanding as to
 4    whether the separation from his son, W.P.G.'s
 5    separation from his son, caused W.P.G. emotional       12:11:52
 6    distress?
 7         A    It did cause emotional distress.  Yes, I
 8    have that in my report.
 9         Q    Do you think that emotional distress was
10    severe?                                                12:12:03
11              MR. BRAKEBILL:  Objection.  Vague and
12    ambiguous.
13              THE WITNESS:  So I would say that when the
14    son was taken away, and for a few days he did not
15    know what had happened to his son, that it would be    12:12:16
16    quite distressful for him, as it would for any
17    parent, to know that you don't know where your child
18    is.
19              But once he realized that the son was in
20    ORR custody, that he was likely being well taken       12:12:37
21    care of, that the emotional distress decreases.
22    BY MR. SILVA:
23         Q    Before he made that purported realization,
24    you would agree that his emotional distress was
25    severe?                                                12:12:52
```

Page 343

| | | |
|---|---|---|
| 1 | MR. BRAKEBILL: Objection. | 12:12:53 |
| 2 | Mischaracterizes testimony. | |
| 3 | THE WITNESS: Medically -- again, I'm not | |
| 4 | sure what you mean by the term "legally" -- but | |
| 5 | medically, yes, he was very worried about his son. | 12:13:01 |
| 6 | It's not a diagnosis, but he was certainly quite | |
| 7 | worried about what would happen to his son. | |
| 8 | And then once he hears that the son is | |
| 9 | likely to be safe, then all of that decreases. | |
| 10 | BY MR. SILVA: | 12:13:21 |
| 11 | Q   There was an incident in a park that | |
| 12 | W.P.G. suffered, and it kind of related to | |
| 13 | hypervigilance. | |
| 14 | Do you remember that incident? | |
| 15 | A   Yes. | 12:13:49 |
| 16 | Q   Do you know what caused that incident? | |
| 17 | A   My understanding is that he saw someone | |
| 18 | who he thought could be gang members, and it brought | |
| 19 | back all of the memories of the gangs in | |
| 20 | El Salvador. | 12:14:00 |
| 21 | Q   Do you think that his hypervigilance in | |
| 22 | that instance stems solely from the gangs in | |
| 23 | El Salvador, or do you also believe that it stemmed | |
| 24 | from his separation from his son? | |
| 25 | MR. BRAKEBILL: Objection. Compound. | 12:14:12 |

Page 344

| | | |
|---|---|---|
| 1 | And then once they were reunited, he | 13:49:14 |
| 2 | actually felt happiness. | |
| 3 | Q   So your understanding of his symptoms -- | |
| 4 | do you think -- withdrawn. | |
| 5 | Do you think he suffered emotional | 13:49:26 |
| 6 | distress for the period of time he was in detention? | |
| 7 | A   I thought I just answered that, that -- I | |
| 8 | thought I just answered that. | |
| 9 | Q   Well, is the answer yes or no? | |
| 10 | At some point during the period of time he | 13:49:46 |
| 11 | was separated from his son, do you think he suffered | |
| 12 | emotional distress? | |
| 13 | A   Yes. | |
| 14 | Q   Do you think it was severe? | |
| 15 | MR. BRAKEBILL:  Objection.  Vague and | 13:49:52 |
| 16 | ambiguous. | |
| 17 | THE WITNESS:  I think that before he knew | |
| 18 | what had happened to his son, again, talking | |
| 19 | medically, that he was worried and that he became, | |
| 20 | very briefly -- very briefly, suicidal. | 13:50:12 |
| 21 | So medically, yes, that was very upsetting | |
| 22 | to him, and that was emotional distress. | |
| 23 | BY MR. SILVA: | |
| 24 | Q   Okay.  You called Dr. Rengifo before | |
| 25 | she -- before she interviewed J.G.G., right? | 13:50:33 |

Page 391