ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
MICHELLE LO (NYRN 4325163)
Chief, Civil Division
KENNETH W. BRAKEBILL (CABN 196696)
Assistant United States Attorney
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7167
    FAX: (415) 436-7169
    kenneth.brakebill@usdoj.gov
    kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WILBUR P.G., et al., | CASE NO. 4:21-CV-04457 KAW |
| Plaintiff, | **DEFENDANT'S TRIAL BRIEF** |
| v. | Pretrial Conference: August 28, 2024 |
| | Time: 2:00 p.m. |
| UNITED STATES OF AMERICA, | Location: United States District Court |
| Defendant. | Courtroom 4 – 3rd Floor |
| | Oakland, California |
| | Trial: September 9, 2024 |
| | The Honorable Kandis A. Westmore |
| | United States Magistrate Judge |

## **Table of Contents**

I.   Factual Background ................................................................................................................. 1

   A.   Policy Background ........................................................................................................ 1

   B.   Policy Objectives Animating the DHS Referral Policy................................................ 2

   C.   Prosecution Amenability Determinations and Subsequent Separations of Families Under the DHS Referral Policy ................................................................................................. 4

   D.   The Plaintiff Families ................................................................................................... 8

II.   Causes Of Action to Be Tried ............................................................................................. 11

   A.   Intentional Infliction of Emotional Distress .............................................................. 11

   B.   Negligence .................................................................................................................. 11

   C.   Abuse of Process ........................................................................................................ 12

   D.   Negligent Supervision/Breach of Fiduciary Duty ..................................................... 12

   E.   Loss of Consortium .................................................................................................... 12

III.   Affirmative Defenses To Be Tried ...................................................................................... 12

   A.   The Court Lacks Subject-Matter Jurisdiction (First Affirmative Defense – Private Person Analog) ........................................................................................................................... 13

   B.   The Court Lacks Subject-Matter Jurisdiction (First Affirmative Defense – Institutional or Systemic Conduct) .................................................................................................................. 13

   C.   The Discretionary Function Exception (Second Affirmative Defense) ..................... 13

   D.   Exception for Actions Taken While Reasonably Executing the Law (Third Affirmative Defense) ................................................................................................................................ 14

   E.   Contractor Exception (Seventh Affirmative Defense) ............................................... 14

   F.   Failure to Mitigate Damages (Seventeenth Affirmative Defense) ............................ 15

   G.   Misrepresentation Exception (Eighteenth Affirmative Defense) .............................. 15

   H.   Prohibition Against Pre-Judgment Interest and Punitive Damages (Twelfth Affirmative Defense) ................................................................................................................................ 15

   I.   Limitation on Post-Judgment Interest (Thirteenth Affirmative Defense) ................. 15

# Table of Authorities

Page(s)

Cases

*Aero Med, Inc. v. White Mountain Communities Hosp., Inc.*,
  2012 WL 4086531 (D. Ariz. Sept. 17, 2012).................................................. 15

*Aguilar v. United States Immigr. & Customs,*
  *Enf't*, 510 F.3d 1 (1st Cir. 2007)................................................................... 14

*Akutowicz v. United States*,
  859 F.2d 1122 (2d Cir. 1988)......................................................................... 13

*Autery v. United States*,
  424 F.3d 944 (9th Cir. 2005) ......................................................................... 15

*B.A.D.J. v. United States*,
  No. CV-21-00215, 2022 WL 11631016 (D. Ariz. Sept. 30, 2022) ................ 13

*Baie v. Sec'y of,*
  *Def.*, 784 F.2d 1375 (9th Cir. 1986).............................................................. 13

*Barnes v. Lopez*,
  25 Ariz. App. 477 (Ct. App. 1976) ................................................................ 15

*Borquez v. United States*,
  773 F.2d 1050 (9th Cir. 1985) ....................................................................... 14

*Butz v. Economou*,
  438 U.S. 478 (1978)........................................................................................ 14

*Comm. of Cent. Am. Refugees v. I.N.S.*,
  795 F.2d 1434 (9th Cir. 1986) ....................................................................... 14

*County of Sacramento v. Lewis*,
  523 U.S. 833 (1998)........................................................................................ 14

*Crackel v. Allstate Ins. Co.*,
  92 P.3d 882 (Ariz. Ct. App. 2004)................................................................. 12

*Dalehite v. United States*,
  346 U.S. 15 (1953).......................................................................................... 14

*Demore v. Kim*,
  538 U.S. 510 (2003)........................................................................................ 14

*Domantay v. United States Dep't of Veterans Affairs*,
No. 18-cv-03726-SK, 2018 WL 10501631 (N.D. Cal. Dec. 10, 2018) ............................... 15

*Elgamal v. United States*,
2015 WL 13648070 (D. Ariz. July 8, 2015) .......................................................... 13

*F.R. v. United States*,
*No. CV-21-00339*, 2022 WL 2905040 (D. Ariz. July 22, 2022) ............................. 13

*Fappani v. Bratton*,
407 P.3d 78 (Ariz. Ct. App. 2017) ..................................................................... 12

*FDIC v. Meyer*,
510 U.S. 471 (1994) ...................................................................................... 11

*Flores v. Lynch*,
212 F.Supp.3d 907 (C.D. Cal. 2015) ................................................................. 5

*Flores v. Sessions*,
394 F.Supp.3d 1041 (C.D. Cal. 2017) ................................................................ 5

*Gen. Dynamics Corp. v. United States*,
139 F.3d 1280 (9th Cir. 1998) ......................................................................... 13

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ...................................................................................... 14

*Johnson v. McDonald*,
3 P.3d 1075 (Ariz. 1995) ................................................................................ 11

*Laird v. Nelms*,
406 U.S. 797 (1972) ................................................................................. 13, 14

*Lee v. United States*,
2020 WL 6573258 (D. Ariz. Sept. 18, 2020) ...................................................... 13

*Logue v. United States*,
412 U.S. 521 (1973) ...................................................................................... 15

*Martin v. Staheli*,
457 P.3d 53 (Ariz. App. 2019) ......................................................................... 12

*McGowan v. United States*,
825 F.3d 118 (2d Cir. 2016) ........................................................................... 13

*Meier v. United States*,
2006 WL 3798160 (N.D. Cal. Dec, 22, 2006) ..................................................... 13

*Milan-Rodriguez v. Sessions*,
   No. 16-cv-1578, 2018 WL 400317 (E.D. Cal. June 6, 2018) ............................ 14

*Mintz v. Bell Atl. Sys. Leasing Intern., Inc.*,
   905 P.2d 559 ............................................................................................ 11

*Mirmehdi v. United States*,
   662 F.3d 1073 (9th Cir. 2011) .................................................................. 14

*Nurse v. United States*,
   226 F.3d 996 (9th Cir. 2000) .................................................................... 14

*Pauly v. U.S. Dep't of Agriculture*,
   348 F.3d 1143 (9th Cir. 2003) .................................................................. 15

*Pierce v. Casas Adobes Baptist Church*,
   162 Ariz. 269 (1989) ................................................................................ 12

*Quiroz v. ALCOA Inc.*,
   416 P.3d 824 (Ariz. 2018) ........................................................................ 12

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ................................................................................. 13

*SDR Assocs. v. ARG Enters., Inc.*,
   170 Ariz. 1 (Ariz. Ct. App. 1991) ............................................................ 15

*Smethers v. Campion*,
   210 Ariz. 167 (Ariz. Ct. App. 2005) ........................................................ 12

*Surowiec v. Capital Title Agency, Inc.*,
   790 F. Supp. 2d 997 (D. Ariz. 2011) ........................................................ 12

*United States v. Flores-Montano*,
   541 U.S. 149 (2004) ................................................................................. 13

*United States v. Gaubert*,
   499 U.S. 315 (1991) ................................................................................. 13

*United States v. Neustadt*,
   366 U.S. 696 (1961) ................................................................................. 15

*Walding v. United States*,
   955 F. Supp. 2d 759 (W.D. Tex. 2013) ..................................................... 15

*Wilson v. Layne*,
   526 U.S. 603 (1999) ................................................................................. 14

**Statutes**

6 U.S.C. § 279............................................................................................................................. 4

8 U.S.C. § 1325 .................................................................................................................... passim

28 U.S.C. § 1346 ............................................................................................................ 11, 13, 14

28 U.S.C. § 1961 ......................................................................................................................... 15

28 U.S.C. § 2674 ......................................................................................................................... 15

28 U.S.C. § 2680 ......................................................................................................................... 13

31 U.S.C. § 1304 ......................................................................................................................... 15

Defendant hereby respectfully submits its trial brief as required by the Court's April 11, 2022 CASE MANAGEMENT AND PRETRIAL ORDER FOR BENCH TRIAL, as modified by the Court's April 11, 2024 ORDER CONTINUING TRIAL AND REMAINING CASE DEADLINE. Dkt. 53, 197.

## I.    Factual Background

### A.    Policy Background

This case arises from various government policies adopted and implemented in the spring of 2018 to combat the increase in unlawful border crossings along the Southwest Border of the United States. After taking office, President Biden denounced those policies and established a task force to continue efforts to reunify families who had been separated.

Further to presidential policy directives set forth in Executive Order 13767 and the Presidential Memoranda issued on April 4, 2018 and April 6, 2018, respectively, Attorney General Jefferson Sessions issued a memorandum for federal prosecutors on April 6, 2018 that directed "each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under" 8 U.S.C. § 1325(a), which prohibits unlawful entry to the United States (the "Zero-Tolerance Policy"). About two weeks later, senior officials at the Department of Homeland Security ("DHS") proposed three prosecution referral policy options to the DHS Secretary (the "DHS Referral Memorandum") in a memorandum titled "Increasing Prosecutions of Immigration Violations." On May 4, 2018, DHS Secretary Kirstjen Nielsen approved Option 3, initiating a policy of referring for prosecution, to the extent practicable, all adults who unlawfully crossed the Southwest border of the United States, "including those initially arriving with minors" ("the DHS Referral Policy").

In preparing and approving the DHS Referral Memorandum, Secretary Nielsen and the agency heads who proposed the policy options[1] determined that unlawful entries across the Southwest Border, including by family units, had increased from March to April 2018 as part of a trend of increasing border crossings that had begun in 2017. These government officials determined that the unlawful

---

[1] These agency heads include Kevin McAleenan, the former Commissioner of U.S. Customs and Border Protection ("CBP"), and Tom Homan, the former Acting Director of U.S. Immigration and Customs Enforcement ("ICE").  The Government will present testimony from both Mr. McAleenan and Mr. Homan at trial.

1  border crossings occurring throughout 2017 and which were expected to continue through the Spring

2  and Summer of 2018 posed serious border security issues and safety risks. They determined that

3  criminal prosecutions were enforcement actions that were effective in reducing illegal border crossings.

4      **B.    Policy Objectives Animating the DHS Referral Policy**

5          The policy objectives of the DHS Referral Policy articulated by DHS officials were manifold: to

6  enforce the law in accordance with the policy directives set forth in Executive Order 13767 and the

7  Presidential Memoranda issued on April 4, 2018 and April 6, 2018; to deter illegal Southwest Border

8  crossings by imposing criminal consequences for unlawful conduct; to dissuade non-citizens from

9  making the dangerous journey to the Southwest border, which is coordinated by and enriches criminal

10  networks; to reduce the operational strain on U.S. Border Patrol resources created by unlawful entries by

11  family units, which diverts limited law enforcement resources from other border security operations; and

12  to ensure that immigration proceedings were promptly completed, and final orders of removal could be

13  effectuated following completion of immigration proceedings. As the Court will hear at trial, the

14  purpose of Secretary Nielsen—who, as the adopting official, is the only official whose intent is legally

15  relevant—in adopting the DHS Referral Policy was to accomplish these law enforcement objectives, not

16  to use separations of parents and children to inflict harm as a deterrent to non-citizens seeking entry into

17  the United States or to prevent immigrants from seeking asylum. Nor will Plaintiffs be able to establish

18  at trial that any other decisionmaker intended that the DHS Referral Policy would use separations of

19  parents and children to inflict harm as a deterrent to non-citizens seeking entry into the United States or

20  to prevent immigrants from seeking asylum.

21          The DHS Referral Memorandum itself sets forth the policy objective of addressing unlawful

22  migration and the specific reasons for not exempting adult members of family units from prosecution

23  referrals. The memorandum noted that "Illegal migration toward the Southwest Border (SWB) continues

24  to rise" and that inadmissible family units "encountered at and between the ports of entry during the

25  period of April 18-19, 2018, reached the highest level since 2016 – at almost 700 per day." The

26  memorandum further states: "Family groups are one of the most challenging populations to the integrity

27  of the immigration enforcement system both because of the strictures placed by the Flores Settlement

28  Agreement, but also because of the costly and challenging nature of operationally addressing their needs

and requirements." The prosecution-referral policy option that Secretary Nielsen ultimately selected was stated to be the option that "would increase the consequences for illegally entering the United States by enforcing existing law, protect children from being smuggled by adults through transnational criminal organizations, and have the greatest impact on current flows." The memorandum further noted that excluding families could undermine the overall purpose of the policy: "If [family units] are excluded from this initiative, the potential for an increase in fraudulent/fictitious [family units] could be an unintended consequence."

Secretary Nielsen and the agency heads who proposed the policy options in the DHS Referral Memorandum, as well as others in DHS responsible for the detention and removal of non-citizens,[2] understood, consistent with then-existing DHS policy—as expressed in the memorandum issued on February 20, 2017 titled "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (the "February 20, 2017 DHS Memorandum") and Executive Order 13767— that the prompt removal of inadmissible non-citizens who had been ordered removed was an effective enforcement action in reducing illegal border crossings.  And these government officials further understood, consistent with then-existing DHS policy—as expressed in the February 20, 2017 DHS Memorandum and Executive Order 13767—that the detention of adult non-citizens pending removal proceedings was an effective measure to ensure that removal proceedings could be completed promptly and removal, if ordered, could be effectuated.

Prior to implementation of the DHS Referral Policy in May 2018, officials and employees of U.S. Customs and Border Protection (a component of DHS that includes U.S. Border Patrol), Health and Human Services (HHS), Department of Justice (DOJ), and U.S. Immigration and Customs Enforcement (ICE) engaged in planning meetings to discuss agency resources and readiness. Secretary Nielsen and the agency heads who proposed the policy options in the DHS Referral Memorandum believed that the agencies and contractors responsible for implementing the DHS Referral Policy were prepared to do so. They also believed that the systems, processes, and practices to be used in implementing the DHS Referral Policy were sufficient.

---

[2] This includes Matthew Albence, the former Associate Director of ICE, Enforcement and Removal Operations ("ICE ERO"), who also will testify on the government's behalf at trial.

**C.      Prosecution Amenability Determinations and Subsequent Separations of Families Under the DHS Referral Policy**

Within days of Secretary Nielsen's approval of the DHS Referral Policy, the U.S. Border Patrol, directed the development of Concepts of Operations ("ConOps") to implement the policy at the local Sector level. The U.S. Border Patrol Yuma Sector in Arizona, where each Plaintiff crossed and was apprehended, created a ConOps that instructed Border Patrol agents to refer to the U.S. Attorney's Office all adults whom the agents determined to be "amenable to prosecution" (that is, a discretionary judgment by Border Patrol agents based on supporting evidence that the adults had violated 8 U.S.C. § 1325(a) and were eligible for prosecution).  These referrals included adults accompanied by children. Pursuant to this directive, Yuma Sector Border Patrol agents utilized pre-existing processes to separate minor children from their parents after the parents were determined to be amenable to prosecution. Pursuant to the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), when an agency takes custody of a noncitizen child for whom "there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody," the agency must designate that child as an "unaccompanied alien child" and transfer custody of the child to the Department of Health and Human Services' Office of Refugee Resettlement ("ORR"). 6 U.S.C. § 279(g)(2). Accordingly, pursuant to law and consistent with pre-existing Border Patrol practices, Yuma Sector Border Patrol agents referred minor children who had been separated from their parents to ORR for placement at private shelters. The family's relationship would be recorded in their immigration paperwork to facilitate their later reunification by ORR under ORR's statutory authority.

To the extent adult non-citizens, including the adult Plaintiffs, were transferred to secure adult ICE custody following initial determinations of their amenability to prosecution, and remained in secure adult ICE custody during the pendency of their immigration removal proceedings, government officials determined that such secure detention was an effective tool to ensure that immigration proceedings could be promptly completed and final orders of removal could be effectuated, consistent with the policy directives set forth in the February 20, 2017 DHS Memorandum and Executive Order.

Due to orders by the U.S. District Court for the Central District of California enforcing the *Flores* Settlement Agreement ("the *Flores* court orders"),[3] ICE generally could not house children in an ICE family residential center ("FRC") for longer than 20 days. Thus, because immigration proceedings typically lasted for longer than 20 days, non-citizen family units apprehended at the U.S.-Mexico border and held together were frequently released into the United States before their immigration removal proceedings were complete. The placement of adult non-citizens, including the adult Plaintiffs, and their children in FRCs (even when temporarily possible or permissible) was therefore viewed by DHS as incompatible with the policy directives in the February 20, 2017 DHS Memorandum and Executive Order 13767 to detain adult non-citizens during the pendency of their immigration proceedings, given the likely release of the parent and child from ICE custody before the completion of their immigration removal proceedings.

Secretary Nielsen and the agency heads who proposed the policy options in the DHS Referral Memorandum understood that implementation of the DHS Referral Policy utilized pre-existing processes and practices on which agency employees and contractors were trained and that were performed regularly in the ordinary course of normal operations, including: processing non-citizen family units upon apprehension by U.S. Border Patrol; consideration of referring an adult for prosecution by Border Patrol to the U.S. Attorney's Office; requesting placement of an unaccompanied alien child ("UAC") with ORR and transferring custody of a child from U.S. Border Patrol to ORR; transferring adults to ICE custody from U.S. Border Patrol; detaining adults in ICE custody pending immigration proceedings; locating an appropriate placement for a child by ORR for their care in a shelter; establishing communications between a separated parent and child; and coordinating between ICE and ORR regarding reunification of a parent and child.

U.S. Border Patrol agents exercised discretion in making various decisions: (1) when a non-citizen child in U.S. Border Patrol custody whose non-citizen parent was amenable to prosecution and appropriate to be referred for criminal prosecution should be designated a UAC under the TVPRA, and (2) when a placement request with ORR should be made. These decisions were susceptible to a

---

[3] *Flores v. Sessions*, 394 F.Supp.3d 1041 (C.D. Cal. 2017); *Flores v. Lynch*, 212 F.Supp.3d 907 (C.D. Cal. 2015).

multitude of policy-based considerations, including application of the TVPRA, the *Flores* Settlement Agreement, and agency guidelines regarding custody of minors and their safety, as well as the impact of the timing of such decisions on agency operations.  Prior to and while the DHS Referral Policy was in effect, as a matter of operational practice, U.S. Border Patrol agents would make a placement request with ORR as soon as possible following apprehension of the child designated as a UAC.  And while the DHS Referral Policy was in effect, when a Yuma Sector Border Patrol agent in the Processing, Screening, and Transportation ("PST") Unit identified an adult non-citizen in a family unit as amenable to prosecution and designated to be processed for prosecution, a request to ORR for placement of the child was made as soon as possible, consistent with processes in place prior to the DHS Referral Policy.

Both before and during the period the DHS Referral Policy was in effect, in instances where Border Patrol agents in the Yuma Border Patrol Station determined that an adult in a family unit was to be processed for a referral for prosecution, and consequently that his or her child would be transferred to ORR custody, as a UAC, it was standard practice that a parent would be informed that his or her child would be transferred to separate custody.  Pursuant to this practice, the adult Plaintiffs were informed that their respective children would be transferred to separate custody.  In instances where a child was transferred to ORR custody and his or her parent was transferred to ICE custody, Border Patrol agents involved in the processing, custody management, or movement and transfer of non-citizens would not know, at the time of separation, how long the parent and child would remain in separate custody.

As a matter of pre-existing operational practice, that continued while the DHS Referral Policy was in effect, when a non-citizen child was transferred to the custody of ORR and the parent was transferred to ICE custody: (1) the separated parent and child could be reunified at the parent's request to be repatriated together upon removal of the parent, through coordination between ICE and HHS; (2) or, if the parent was released from ICE custody, the parent could seek release of the child from ORR. To the extent a family unit was separated as a result of enforcement actions taken pursuant to the DHS Referral Policy, the placement in separate custody was expected to be temporary, lasting for the duration of the parent's immigration proceedings if the parent was not granted release sooner.

Moreover, prior to the implementation of the DHS Referral Policy in May 2018, enhancements were made to U.S. Border Patrol's e3 system to document separations of family units apprehended by

U.S. Border Patrol.  In addition, the electronic system through which Border Patrol agents would make a request to ORR for placement of a UAC contained a feature in which Border Patrol agents could include information about the child's relatives, including the name and Alien Registration Number of the parent from whom the child had been separated, which would enable ORR and its contractors to identify when separations occurred and to coordinate with ICE on communications between and reunifications of the parent and child.

Information entered into e3 as part of the Form I-213s by Yuma Sector Border Patrol regarding separated parents and children was available to ICE through its Enforcement and Removal Module (EARM) and was communicated to the ICE Phoenix Field Office (including the Field Office Juvenile Coordinators or "FOJCs") through email notifications, enabling ICE to identify when separations occurred and to coordinate with ORR and its contractors regarding communications between and reunifications of parents and children.

Prior to the implementation of the DHS Referral Policy in May 2018, a Parental Interests group was formed between ICE and HHS to facilitate improvements and efficiencies in enabling communications between parents and children in separate custody and the reunification of parents and children.  And during the implementation of the DHS Referral Policy, employees and officials with CBP, ICE, and HHS engaged in ongoing efforts to refine and improve processes in place relating to providing information to parents whose children were placed in ORR custody, documenting placement of a parent and child in separate custody, establishing communications between a separated parent and child, and coordinating reunification of a parent and child.

In May and June 2018, when the DHS Referral Policy was in effect and applicable to adults traveling in family units, Border Patrol's Yuma Sector was experiencing a high volume of non-citizen apprehensions at an irregular and fluctuating rate, with a daily average of 392 detainees in custody. During these months, over forty percent of the family units that unlawfully crossed the U.S.-Mexico border that were apprehended in the Yuma Sector were not separated.  Indeed, from the initial implementation of the DHS Referral Policy on May 5, 2018 until the Executive Order on June 20, 2018, the majority of family units that unlawfully crossed the U.S.-Mexico border were not separated.

1

**D.      The Plaintiff Families**[4]

2

    **1.      Plaintiff Family One: WPG and WBPE**

3

WPG and his son WBPE are citizens of El Salvador, ████████████████



10

    After an initial detention together, WPG and his son were separated after U.S. Border Patrol

11

agents determined that WPG was amenable for prosecution. WBPE was processed as a UAC, transferred

12

into the care and legal custody of ORR ████████████████████████████████

---

26

27

28

[4] Plaintiffs have designated the entirety of depositions of witnesses who worked at the ORR care providers for the Plaintiff children, as well as those of witnesses who provided any care for Plaintiffs after reunification in 2018, as confidential under the Protective Order. Therefore the government is unable in a public filing to explain the causation evidence it will present at trial.

1
2
3
4
5

### 2.   Plaintiff Family Two: JGG and KGG

JGG and his son KGG are citizens of Guatemala,

8
9
10
11
12
13
14
15

After initial detention together, JGG and his son were separated after U.S. Border Patrol agents

determined that JGG was amenable for prosecution. KGG was processed as a UAC, transferred into the

care and legal custody of ORR

19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

**3.     Plaintiff Family Three: ECM and YMC**

ECM and her daughter YMC are citizens of Guatemala,

After initial detention together, ECM and YMC were separated after U.S. Border Patrol agents determined that ECM was amenable to prosecution. YMC was processed as a UAC, transferred into the care and legal custody of ORR,

## II.   Causes Of Action to Be Tried

Plaintiffs bring suit under the Federal Tort Claims Act.  To succeed on any of their claims, Plaintiffs must establish the six elements set forth at 28 U.S.C. § 1346(b)(1): the claim is "[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of an[] employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)(1) (brackets in original).

Here, Plaintiffs assert five causes of action under Arizona law for trial: (1) intentional infliction of emotional distress (IIED); (2) negligence; (3) abuse of process; (4) negligent supervision/breach of fiduciary duty; and (5) loss of consortium. The Court will hear evidence that Plaintiffs do not establish their burden of proof for elements of each of their causes of action.

### A.   Intentional Infliction of Emotional Distress

To succeed on their cause of action for IIED, Plaintiffs will need to prove that the government's conduct was (1) extreme and outrageous; (2) either intentional or reckless; and (3) caused the Plaintiff to suffer severe emotional distress.  *See Johnson v. McDonald*, 3 P.3d 1075, 1080 (Ariz. 1995).  The conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Mintz v. Bell Atl. Sys. Leasing Intern., Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995

### B.   Negligence

For their negligence claim, Plaintiffs will need to prove "(1) a duty requiring the defendant to conform to a certain standard of care; (2) breach of that standard; (3) a causal connection between the breach and the resulting injury; and (4) actual damages." *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 827-28 (Ariz. 2018).

### C.     Abuse of Process

For their abuse of process claim, Plaintiffs will need to prove that the government committed "(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Fappani v. Bratton*, 407 P.3d 78, 81 (Ariz. Ct. App. 2017). The "process" that was "abused" must be "something more than the opposing party's mere persistence in the litigation." *Crackel v. Allstate Ins. Co.*, 92 P.3d 882, 888 (Ariz. Ct. App. 2004). Moreover, "plaintiffs must not only present evidence that the defendant used a court process for a primarily improper purpose, they must also show that, in using the court process, the defendant took an action that could not logically be explained without reference to the defendant's improper motives." *Id.* at 889.

### D.     Negligent Supervision/Breach of Fiduciary Duty

"An actor who breaches a fiduciary duty is subject to liability to the person to whom the duty was owed." Restatement (Third) of Torts, Liab. for Econ. Harm § 16 (2020). "[I]n an action asserting a claim for breach of fiduciary duty, 'like all tort actions, a plaintiff must allege and prove the existence of a duty owed, a breach of that duty, and damages causally related to such breach.'" *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1004 (D. Ariz. 2011) (quoting *Smethers v. Campion*, 210 Ariz. 167, 170 (Ariz. Ct. App. 2005)).

### E.     Loss of Consortium

"Loss of consortium is a derivative claim, which means that the success of a loss-of-consortium claim is dependent on the success of another claim." *Martin v. Staheli*, 457 P.3d 53, 58 (Ariz. App. 2019). However, to recover for loss of consortium, Plaintiffs must additionally prove "the child suffer[ed] a severe, permanent, and disabling injury that substantially interferes with the child's capacity to interact with his parents in a normally gratifying way." *Pierce v. Casas Adobes Baptist Church*, 162 Ariz. 269, 272 (1989).

### III.     Affirmative Defenses To Be Tried

At trial Defendant will present evidence in support of several defenses to Plaintiffs' claims.

## A.   The Court Lacks Subject-Matter Jurisdiction (First Affirmative Defense – Private Person Analog)

Under the FTCA's waiver of sovereign immunity, the United States only may be held liable in the same manner and to the same extent as a private individual under like circumstances.  28 U.S.C. §§ 1346(b)(1), 2674; *See, e.g., Elgamal v. United States*, 2015 WL 13648070 at *5 (D. Ariz. July 8, 2015), *aff'd by Elgamal v. Bernacke*, 714 Fed. App'x 741 (9th Cir. 2018); *Akutowicz v. United States*, 859 F.2d 1122, 1125-26 (2d Cir. 1988); *McGowan v. United States*, 825 F.3d 118, 127 (2d Cir. 2016).

## B.   The Court Lacks Subject-Matter Jurisdiction (First Affirmative Defense – Institutional or Systemic Conduct)

The FTCA's limited waiver of sovereign immunity makes the United States liable only under principles of *respondeat superior* for the negligent or wrongful acts or omissions of "employee[s] of the Government" while acting within the scope of their employment. *See* 28 U.S.C. § 1346(b)(1); see also *Laird v. Nelms*, 406 U.S. 797, 801 (1972).  Therefore, the Court does not have subject matter jurisdiction over Plaintiffs' claims that are based upon institutional or systematic conduct rather than the acts or omissions of individual officials or employees acting within the scope of their employment.  28 U.S.C. § 1346(b)(1); *see also, e.g.*, *Meier v. United States*, 2006 WL 3798160, at *3-4 (N.D. Cal. Dec, 22, 2006), *aff'd*, 310 F. App'x 976 (9th Cir. 2009); *Lee v. United States*, 2020 WL 6573258 at *6 (D. Ariz. Sept. 18, 2020); *F.R. v. United States, No. CV-21-00339*, 2022 WL 2905040 at *3 (D. Ariz. July 22, 2022); *B.A.D.J. v. United States*, No. CV-21-00215, 2022 WL 11631016 *5 (D. Ariz. Sept. 30, 2022).

## C.   The Discretionary Function Exception (Second Affirmative Defense)

The court also does not have subject matter jurisdiction over claims that are protected by the FTCA's discretionary function exception, which bars "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a); *see also, e.g.*, *United States v. Gaubert*, 499 U.S. 315, 328-32 (1991); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999); *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998); *Baie v.*

*Sec'y of Def.*, 784 F.2d 1375, 1377 (9th Cir. 1986); *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986); *Mirmehdi v. United States*, 662 F.3d 1073, 1081-82 (9th Cir. 2011).

To the extent Plaintiffs seek to avoid the discretionary function exception by asserting a constitutional violation, Plaintiffs must prove that the challenged conduct violated the Constitution, the constitutional prohibition or proscription at issue was mandatory and specific, and the constitutional right was clearly established at the time of the challenged conduct. *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614-615 (1999); *Butz v. Economou*, 438 U.S. 478 (1978); *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000); *Aguilar v. United States Immigr. & Customs Enf't*, 510 F.3d 1, 22 (1st Cir. 2007) (citations omitted); *Milan-Rodriguez v. Sessions*, No. 16-cv-1578, 2018 WL 400317 at *9-10 (E.D. Cal. June 6, 2018).  A constitutional violation, including a due process violation, cannot be premised on negligent conduct.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

### D.  Exception for Actions Taken While Reasonably Executing the Law (Third Affirmative Defense)

The Court does not have subject matter jurisdiction over Plaintiffs' claims that are "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid[.]"  28 U.S.C.§ 2680(a); *see, e.g.*, *Dalehite v. United States*, 346 U.S. 15, 33 (1953); *Borquez v. United States*, 773 F.2d 1050 (9th Cir. 1985).

### E.  Contractor Exception (Seventh Affirmative Defense)

The FTCA's limited waiver of sovereign immunity makes the United States liable only under principles of *respondeat superior* for the negligent or wrongful acts or omissions of "employee[s] of the Government" while acting within the scope of their employment.  *See* 28 U.S.C. § 1346(b)(1); *see also Laird v. Nelms*, 406 U.S. 797, 801 (1972).

The court therefore does not have subject matter jurisdiction over Plaintiffs' claims that are based on acts or omissions by contractors or employees of contractors.  28 U.S.C. § 1346(b)(1); *see also*,

1   *e.g.*, *Logue v. United States*, 412 U.S. 521, 526 (1973); *Autery v. United States*, 424 F.3d 944, 957 (9th

2   Cir. 2005); *Walding v. United States*, 955 F. Supp. 2d 759, 771-72 & 783 (W.D. Tex. 2013).

3       **F.   Failure to Mitigate Damages (Seventeenth Affirmative Defense)**

4       "A plaintiff's failure to mitigate damages may be invoked to negate or reduce damages 'where

5   the plaintiff by his own voluntary activity has unreasonably exposed himself to damage or increased his

6   injury.'" *SDR Assocs. v. ARG Enters., Inc.*, 170 Ariz. 1, 4 n.2 (Ariz. Ct. App. 1991) (quoting

7   McCormick on Damages, § 34 at 131 (1934)).  "This doctrine, also known as the doctrine of avoidable

8   consequences, precludes a plaintiff from recovering any losses it could have avoided by taking

9   reasonable actions."  *Aero Med, Inc. v. White Mountain Communities Hosp., Inc.*, 2012 WL 4086531, at

10  *6 (D. Ariz. Sept. 17, 2012) (citing *Barnes v. Lopez*, 25 Ariz. App. 477, 481 (Ct. App. 1976)).

11      **G.   Misrepresentation Exception (Eighteenth Affirmative Defense)**

12      The Court does not have subject matter jurisdiction over Plaintiffs' claims that are shielded by

13  the misrepresentation exception to the FTCA, which bars "[a]ny claim arising out of . . .

14  misrepresentation [or] deceit[.]" 28 U.S.C.§ 2680(h).  *See, e.g., United States v. Neustadt*, 366 U.S. 696,

15  702 (1961); *Pauly v. U.S. Dep't of Agriculture*, 348 F.3d 1143, 1151 (9th Cir. 2003).).

16

17      **H.   Prohibition Against Pre-Judgment Interest and Punitive Damages (Twelfth Affirmative Defense)**

18      The United States "shall not be liable for interest prior to judgment or for punitive damages" in

19  claims brought under the Federal Tort Claims Act.  28 U.S.C. § 2674; *see also, e.g.*, *Domantay v. United*

20  *States Dep't of Veterans Affairs*, No. 18-cv-03726-SK, 2018 WL 10501631, at *2 (N.D. Cal. Dec. 10,

21  2018) ("According to 28 U.S.C. § 2674, the United States cannot be liable for a claim of punitive

22  damages.").

23      **I.   Limitation on Post-Judgment Interest (Thirteenth Affirmative Defense)**

24      To the extent the Court enters a money judgment against the United States, Plaintiffs are entitled

25  to post-judgment interest only in accordance with the provisions of 28 U.S.C. § 1961(b) and 31 U.S.C.

26  § 1304(b).

27

28

1    DATED: July 23, 2024                          Respectfully submitted,

2                                                  ISMAIL J. RAMSEY
                                                   United States Attorney
3
                                                   */s/ Kenneth W. Brakebill*
4                                                  KENNETH W. BRAKEBILL
                                                   KELSEY J. HELLAND
5                                                  Assistant United States Attorney

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28